**CITY OF SARASOTA, Petitioner,**

v.

**ENVIRONMENTAL PROTECTION AGENCY and Lee M. Thomas, Respondents.**

No. 85–3655.

United States Court of Appeals, Eleventh Circuit.

April 3, 1987.

vania, sitting by designation.

Christopher L. Rissetto, Washington, D.C., Richard J. Taylor, Sarasota, Fla., Edward P. de la Parte, Tampa, Fla., for petitioner.

Thomas W. Reese, St. Petersburg, Fla., for amicus curiae Save Our Bays Assoc. Inc.

\* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. 33 U.S.C. § 1369(b)(1) provides as follows:
 Review of the Administrator's action (A) in promulgating any standard of performance under section 1316 of this title, (B) in making any determination pursuant to section 1316(b)(1)(C) of this title, (C) in promulgating any effluent standard, prohibition or pretreatment standard under section 1317 of this title, (D) in making any determination as to a State permit program submitted under 1342(b) of this title, (E) *in approving or promulgating any effluent limitation or other limitation under section 1311, 1312, or 1316 of this title,* and (F) in issuing or denying any permit under section 1342 of this title, may be had by any interested person in the Circuit Court of Appeals for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days by such person. Any such appli-

George B. Henderson, U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Catherine A. Winer, U.S. EPA, Washington, D.C., for respondents.

Before RONEY, Chief Judge, GODBOLD, Circuit Judge, and ATKINS \*, Senior District Judge.

ATKINS, Senior District Judge:

The City of Sarasota, Florida (Sarasota) seeks direct review, under Section 509(b)(1) of the Clean Water Act, 33 U.S.C. § 1369(b)(1) (1982), of an Environmental Protection Agency (EPA) decision denying funding for construction of a land-based spray irrigation sewage treatment plant. Section 1369 provides for review in the courts of appeals of specified EPA actions.[1] Because it does not provide for review of funding decisions, we dismiss the appeal for lack of jurisdiction.

### FACTS

This case arises out of EPA's denial of grant funding for an alternative wastewater treatment project proposed by Sarasota following a series of grant-related reviews under the Clean Water Act.[2] Sarasota's

cation shall be made within ninety days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day.
(Emphasis added.)

2. The Clean Water Act, 33 U.S.C. §§ 1251–1376 (1982), established a comprehensive program "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." It provides federal grants to reimburse municipalities for a portion of the costs of wastewater treatment facilities. The Act prohibits the discharge of pollutants into the waters of the United States except in accordance with a National Pollutant Discharge Elimination Permit, or NPDES permit. NPDES permits are issued to pollutant dischargers and list the types and amounts of pollutants that they may discharge. The list is formulated according to two primary types of regulation: water quality standards and effluent limitations.

increasing concern that its continuing discharge of treated wastewater into Whitaker Bayou was degrading the water quality of Sarasota Bay prompted its proposal. It submitted a facilities plan to EPA which provided for the expansion and upgrading of the existing plant and recommended land treatment by spray irrigation as an alternative to effluent discharge to Sarasota Bay.[3]

The proposal was first reviewed by EPA Headquarters in 1980 for compliance with "advanced treatment" (AT) requirements.[4] Headquarters concluded that available information was insufficient to determine whether removal of any or all effluent discharge to Sarasota Bay would significantly improve water quality in the Bay.[5] It therefore deferred funding on the land treatment portion of the project pending further water quality studies, but awarded a grant for designing and constructing the upgraded and expanded treatment facility.

Upon completion of further water quality studies, the State of Florida (State) submitted a wasteload allocation[6] to EPA regional offices. The wasteload allocation stated that water quality and modeling factors did not support provision for treatment greater than secondary treatment[7]

for discharge to Sarasota Bay. It noted, however, that advanced waste treatment is required of any discharge to the Bay in accordance with the Sarasota County ordinance requiring this level of treatment.

On April 17, 1984, EPA approved the State's conclusion, stating:

> The conclusion, based on technical reasons, that there is no need for treatment greater than secondary for discharge to the Bay, is supportable. This conclusion will be used by EPA in determining the eligibility of proposed wastewater facilities for grant funds in Sarasota. *At that time, the NPDES permit for Sarasota will reflect the State's advanced treatment requirements if the permit is certified to EPA with those requirements.*

A.R. Item # 25 (emphasis added). EPA regional offices reissued an NPDES permit to Sarasota on November 28, 1984, that requires elimination of the current discharge to Whitaker Bayou by July 1, 1988. A.R. Item # 29. This permit has never been challenged, and Sarasota has never applied for a permit to discharge directly to Sarasota Bay.[8]

On January 31, 1985, the State requested EPA to evaluate the project for a second

---

3. The proposed project would eliminate effluent discharge to Sarasota Bay. Sewage would be pumped sixteen miles to a proposed spray irrigation field site where the waste would be spread and filtered. The sewage leachate would discharge into the surrounding creek, lake and river. Apparently, because of this discharge, EPA received a notice of intent to sue by surrounding landowners upset over the proposed field site. A.R. Item # 66.

4. Advanced treatment of municipal waste includes procedures designed to obtain a higher quality effluent discharge, such as removal of nutrients including nitrogen.

5. As noted by this Court in *City of Sarasota v. EPA*, 799 F.2d 674, 676 n. 4 (11th Cir.1986), EPA was concerned that the large capital cost of the proposed project was due to stringent state effluent quality requirements for coastal bay dischargers and stringent pre-land application treatment requirements. EPA apparently suspected that neither of these state requirements could be justified on their technical merits. EPA also feared some of the anticipated environmental impacts of the spray irrigation project and questioned Sarasota's projected eco-

nomic return from the agricultural production on the irrigated land.

6. A wasteload allocation is a determination of the quantity of waste that can be assimilated by a receiving water without violating water quality standards for that body of water. *See* 33 U.S.C. § 1313(d).

7. Conventional or secondary treatment of municipal waste includes biological processes, primarily decomposition, with or without chemical disinfectants, to remove organic wastes. As an effluent limitation, secondary treatment refers only to treatment provided by publicly owned treatment works, such as that proposed by Sarasota. It is never used to describe a limitation on industrial dischargers.

8. Sarasota's state permit, issued on December 11, 1984, required it to begin construction of an effluent disposal system which would eliminate all discharges into Whitaker Bayou and Sarasota Bay on or before September 1, 1985. If federal or state funds were not available, the state permit extended the deadline for initiating construction of the new system until November 1, 1986. A.R. Item # 30.

time, based upon further studies submitted by Sarasota.[9] This request did not seek EPA approval of any revision of the waste-load allocation for secondary treatment previously approved by EPA on April 17, 1984, but rather sought review of compliance with AT requirements. EPA responded on February 28, 1985. EPA informed the State that Sarasota's water quality analyses in support of its no-discharge alternative were still insufficient to satisfy AT requirements, and confirmed its previous finding of support for secondary treatment only.

> It will be necessary for the State to complete its review and, if necessary, clarify the State's position with regard to a discharge to Sarasota Bay. Currently, the approved wasteload allocation is for secondary treatment.

A.R. Item # 43.

At Sarasota's request, EPA Headquarters conducted a third grant review of the proposed project. That review included meetings with Sarasota's representatives, evaluation of additional studies, and consultation with EPA experts. A.R. Items # 51, 54, 59, 60, 63. Sarasota argued in that review that significant water quality benefits would in fact result from removal of discharge to the Bay by means of the spray irrigation project in the form of seagrass restoration. On June 11, 1985, Headquarters again found that "the proposed removal of discharge from Sarasota Bay lacked water quality support related to seagrass improvement necessary for a fa-vorable funding decision." It is this decision that Sarasota appeals.

## EPA ACTION NOT REVIEWABLE

EPA's June 11, 1985 decision that Sarasota's proposed project would not result in significant water quality benefits was exclusively a grant funding decision and not, as Sarasota argues, a decision regarding effluent limitations or a decision authorizing discharge to Sarasota Bay. The letter does not mention effluent limitations; it deals exclusively with whether the proposed project would provide significant water quality benefits so as to be eligible for AT funds. More specifically, it focuses on the issue of whether a zero discharge would improve seagrasses in the Bay.

Sarasota asserts that Title II, construction grants review, Title III, enforcement, and Title IV, NPDES permits, are interdependent, such that a final decision on appropriate effluent limitations is a necessary corollary to AT funding determinations. This conceptualization misconstrues the overlap between these aspects of the statutory scheme, and overlooks the procedural distinctions underlying effluent limitation determinations and AT funding decisions.

As to effluent limitations, EPA can only authorize discharge to Sarasota Bay, and could only impose an effluent limitation on a discharger, through the NPDES permitting process. Section 1342(a)(1); 40 C.F.R. § 124 (1985). No application is pending for a discharge permit to the Bay.[10]

---

**9.** The State was also reviewing this information pursuant to Sarasota's request for a review of the wasteload allocation for Sarasota Bay. The State qualified its prior wasteload allocation by stating that (1) any discharge to the Bay must not be within 1800 feet of the mouth of Whitaker Bayou, and (2) Class II shellfishing waters must not be affected by the discharge.

**10.** If a discharger applied to EPA for a permit under Part 122 or Part 124, public participation would be required prior to issuing a permit. 40 C.F.R. § 124.10. Sarasota could participate in that permitting process pursuant to 40 C.F.R. § 124.11, *inter alia,* and if EPA decided to issue a permit, Sarasota could appeal that decision through the administrative process, 40 C.F.R. § 124.74, and ultimately to this court under § 1369. Furthermore, as Sarasota has stated, pursuant to § 1311(b)(1)(C) of the Clean Water Act, EPA is required to assure that NPDES permits comply with water quality standards, treatment standards, or schedules of compliance, established pursuant to any state law or regulations. In establishing NPDES permit limitations, EPA does not look behind a state's water quality standards to see whether it is unnecessarily stringent. Under Florida law, advanced waste treatment is the minimum that the state can require in Sarasota Bay since the state must support local treatment requirements that are more stringent than state requirements. *Fla. Stat.* §§ 403.182(6), 403.182(7) (1984). The local county ordinance which governs requires AT for discharge into the Bay. Thus, any NPDES permit issued by EPA to authorize a discharge to the Bay would reflect limits of at least advanced treatment.

As to advanced treatment, EPA can only award funding after it has determined that a proposed project is necessary and that it will definitely provide significant water quality benefits prior to awarding EPA grant funds. To determine whether significant water quality benefits exist, EPA must examine water quality data developed by the State. This examination includes, among other things, a consideration of proposed effluent limitations for a particular discharger.

The AT policy states that "AT review criteria and technical procedures should be *considered* in the development and review of water quality standards and in the processes for translating these standards in water quality based effluent limitations for National Pollutant Discharge Elimination System." 49 Fed.Reg. 21,462 (1984) (emphasis added).

However, the policy also provides the following:

AT project reviews do not substitute for EPA's required review of water quality standards because the AT reviews are predicated on a different objective, are project-specific, and *result in an EPA funding decision.* Although the reviews may raise questions about the impact of a State standard on discharges in a segment, *a separate State-initiated action is necessary to review and revise the standards.*

*Id.* at 21,464 (emphasis added).

With respect to an EPA determination that the proposed AT processes are unjustified, the policy recognizes that "[b]ased on State policy or regulation, the State may require the grantee to construct the deferred AT components." *Id.* at 21,465. However, EPA will approve grant funding only for secondary treatment and justified AT components, and will not fund the additional deferred AT components. *Id.*

Similarly, the "[d]eferral of funding for AT facilities under the provisions of this policy does not relieve the NPDES permit holder from the enforceable provisions of the Clean Water Act...." *Id.* at 21,465. Clearly, these provisions of the AT policy demonstrate that the permitting and AT grant funding functions of the Agency have different objectives and are distinctly separate.

EPA's April 17, 1984 letter stated explicitly that EPA's approval of the State wasteload allocation was solely for purposes of determining grant eligibility and that EPA would include more stringent effluent limitations in the NPDES permit if requested to do so by the State as part of the permitting process.

Finally, Sarasota admits that it has not applied to, and does not intend to, discharge to the Bay. Under the Clean Water Act effluent limitations apply to dischargers or classes of dischargers rather than specified bodies of water. Note the language of section 1362: "[Effluent limitations are restrictions] on quantities, rates and concentrations of chemicals, physical, biological, and other constituents which are discharged *from point sources* into navigable waters...." (Emphasis added.) Here, EPA did not have for its consideration an application submitted by a specific discharger for which to approve an effluent limitation.

## CONCLUSION

EPA's June 11, 1985 decision that Sarasota's proposed project would not result in significant water quality benefits was exclusively a grant funding decision and not a decision regarding effluent limitations, and certainly not a decision authorizing a discharge to the bay. The appeal is DISMISSED.