Nick **CARR**, and William H. **George**, **Jr.**, Plaintiffs–Appellants,

v.

**ALTA VERDE INDUSTRIES, INC.**, Defendant–Appellee.

No. 89–1991.

United States Court of Appeals, Fifth Circuit.

May 14, 1991.

---

Stuart N. Henry, Henry, Kelly & Bunch, Myron J. Hess, Austin, Tex., for plaintiffs-appellants.

Roger James George, Jr., Julie A. Ford, Graves, Dougherty, Hearon & Moody, Austin, Tex., for defendant-appellee.

## ON PETITION FOR REHEARING

(Opinion February 8, 1991, 5th Cir., 924 F.2d 558)

Before CLARK, Chief Judge, and REAVLEY and KING, Circuit Judges.

KING, Circuit Judge:

We grant plaintiffs-appellants petition for rehearing, withdraw our opinion reported at 924 F.2d 558, and substitute the following:

The plaintiffs-appellants Nick Carr and William H. George (the plaintiffs) sought civil penalties and injunctive relief for violations of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq.*, commonly known as the Clean Water Act (the Act), against the defendant-appellee Alta Verde Industries (Alta Verde).[1] After a bench trial, the district court dismissed the suit for lack of standing under *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), reasoning that no violations of the Act had occurred on or since the date of the complaint and no violations were likely in the future because Alta Verde fit within an exception to the National Pollutant Discharge Elimination System (NPDES) permit requirement. Because the Environmental Protection Agency's (EPA) effluent limitations guidelines do not create such an exception to the NPDES permit requirement, we conclude that Alta Verde's failure to obtain a permit amounted to a continuing violation of the Act, and any discharges in the future will amount to intermittent violations. The district court erred, therefore, in concluding that the plaintiffs lacked standing to bring a citizen suit, and we reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Alta Verde is a cattle feedlot with between 20,000 and 30,000 head of cattle and 230.9 acres of land. Waste from the feedlot, primarily cow manure, drains into a wastewater disposal system of six holding ponds. Alta Verde then uses this water to irrigate and fertilize three adjacent fields.

Between April and July, 1987, a series of heavy rains exceeded the capacity of the holding ponds. In early June, Alta Verde cut a spillway out of the embankment of one of the holding ponds and discharged

---

1. The plaintiffs sought civil penalties in the amount of $600,000 and injunctions ordering Alta Verde to cease all discharges except in compliance with the Clean Water Act, to provide certain reports for one year to plaintiffs, and to provide notice to plaintiffs within 24 hours of any discharge.

wastewater into an unnamed tributary of Rosita Creek. Other discharges also may have resulted from the heavy rains in 1987.

The plaintiffs filed suit on December 14, 1987, alleging that Alta Verde's discharges in 1987 without an NPDES permit violated the Act. After a bench trial, the district court dismissed the suit for lack of standing under *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987), in which the Supreme Court held that citizens do not have standing to seek civil penalties for wholly past violations of the Act. The district court reasoned that no discharges (and therefore no violations of the Act) had occurred on or since the filing of the complaint. In addition, any discharges that might occur in the future would not be violations of the Act, the district court reasoned, because Alta Verde did not have to obtain an NPDES permit since it met the EPA's effluent limitation guidelines for concentrated animal feeding operations. Any violations that had occurred, according to the district court, were wholly past and the plaintiffs lacked standing to bring suit. The plaintiffs appeal, arguing: (1) that the district court erred in holding that Alta Verde was exempt from the NPDES permit requirement and (2) that the district court erred in holding that Carr and George did not have standing to sue.

■■■ We review the district court's factual findings under the clearly erroneous standard and will reject such findings only if our review of the entire record impels the definite and firm conviction that a mistake has been committed. *Joseph v. St. Charles Parish School Bd.,* 736 F.2d 1036, 1038 (5th Cir.1984). We review the district court's conclusions of law *de novo.*

## II. ANALYSIS

### A. Permit Requirement

The district court found that Alta Verde met the Act's definition of a point source

but concluded that Alta Verde's compliance with the EPA's effluent limitation guidelines for concentrated animal feeding operations excused it from the NPDES permit requirement. The district court erred, the plaintiffs argue, because all feedlots that fit the definition of a point source must comply with the NPDES permit program. In response, Alta Verde does not attempt to support the district court's conclusion that the effluent limitation guidelines provide an exception to the permit requirement. Rather, Alta Verde argues that it does not meet the definition of a point source.[2] We conclude that the district court did not clearly err in finding that Alta Verde is a point source, but improperly concluded that the effluent limitation guidelines provide an exception to the NPDES permit requirement.

### 1. Statutory framework

Congress passed the Federal Water Pollution Control Act Amendments in 1972 with the stated purpose of restoring and maintaining the integrity of the nation's waters. 33 U.S.C. § 1251(a). To achieve this goal, the Act requires the strict enforcement of certain technology-based effluent limitations. *See Natural Resources Defense Council, Inc. v. Costle,* 568 F.2d 1369, 1371 (D.C.Cir.1977). As the primary means for enforcing these effluent limitations, Congress established the NPDES permit system. *Id.; see also Environmental Protection Agency v. California ex rel. State Water Resources Control Bd.,* 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976). In order for any person lawfully to discharge any pollutant from a point source into navigable waters of the United States, that person must obtain an NPDES permit and comply with its terms. 33 U.S.C. § 1311(a) ("Except as in compliance with this section [and certain other sections] of this title, the discharge of any pollutant by any person shall be unlawful."). The Supreme Court explained:

Under the NPDES, it is unlawful for any person to discharge a pollutant without

---

**2.** Alta Verde does not state that the district court clearly erred in reaching this conclusion. In fact, Alta Verde inexplicably fails even to mention that the district court found that it meets the definition of a concentrated animal feeding operation and, therefore, of a point source.

obtaining a permit and complying with its terms. An NPDES permit serves to transform generally applicable effluent limitations and other standards—including those based on water quality—into the obligations (including a timetable for compliance) of the individual discharger, and the [1972] Amendments [to the Act] provide for direct administrative and judicial enforcement of permits.

*State Water Resources Control Bd.*, 426 U.S. at 205, 96 S.Ct. at 2025; *see also Costle*, 568 F.2d at 1376.

Among other conditions, an NPDES permit must incorporate effluent limitations for point sources based on guidelines "promulgated by EPA on an industry-by-industry basis under 33 U.S.C. §§ 1311(b), 1314." *American Petroleum Inst. v. Environmental Protection Agency*, 787 F.2d 965, 969 (5th Cir.1986). The guidelines do not specify the use of a particular technology. Rather, they establish effluent limitations that can be achieved only through the use of a certain quality of technology. Section 1311(b)(2)(A) requires the EPA to establish effluent limitations guidelines for existing point sources other than publicly owned treatment works based on the application of the "best available technology economically achievable" (BAT). BAT provides the criteria for issuing NPDES permits, replacing the case-by-case method previously employed, and also provides the basis for the effluent limitations issued as part of the permit's conditions. *American Petroleum Inst.*, 787 F.2d at 969.

### 2. Application to Alta Verde

The Act defines "point source" to include "concentrated animal feeding operations." 33 U.S.C. § 1362(14); 40 C.F.R. § 122.23(a) (1988). An animal feeding operation

is a concentrated animal feeding operation if ... more than 300 slaughter or feeder cattle [are contained] and pollutants are discharged into navigable waters ...

Provided, however, that no animal feeding operation is a concentrated animal feeding operation as defined above if such animal feeding operation discharged

only in the event of a 25–year, 24–hour storm event.

40 C.F.R. § 122 Appendix B (1988). In other words, an animal feeding operation must contain more than a specified number of animals and must discharge pollutants into navigable waters. Even if it meets these two requirements, however, the regulations except feeding operations that discharge pollutants only on the occurrence of a 25–year, 24–hour storm event. The parties agree that Alta Verde met the first two requirements—it is well above the size requirement, and it discharged into navigable waters. The dispute turns on whether Alta Verde fits within the exception for feedlots that discharge only on the occurrence of a 25–year, 24–hour storm event.

A 25–year, 24–hour storm event is a rainfall event with a probable recurrence interval of once in twenty-five years. 40 C.F.R. § 412.11(e) (1988). The parties stipulated that a 25–year, 24–hour storm event means, for the Eagle Pass area, 7.1 inches of rainfall within a 24–hour period. Alta Verde did not discharge in 1987 as a result of such a heavy storm, which has not occurred since 1936, but because the combined rainfall that spring exceeded the capacity of Alta Verde's wastewater disposal system. The district court noted that, depending on which experts one believes, Alta Verde's capacity at the time of the complaint, and at the time of the discharges, was either slightly more or less than needed to contain the runoff from a 25–year, 24–hour storm event. Alta Verde made improvements to its wastewater disposal system, however, and the district court found that the system as improved could contain the runoff from such a storm event.

 Alta Verde contends that it is not a point source because the EPA's definition of a concentrated animal feeding operation excludes operations that discharge only in the event of a 25–year, 24–hour storm event. Because, as the district court found, it currently can contain the runoff from a 25–year, 24–hour storm event, Alta Verde argues that it fits within this exception. Alta Verde's construction of the

EPA's definition, however, ignores the critical word "only." Alta Verde clearly can and did discharge as the result of rains in 1987 that did not amount to a 25–year, 24–hour storm event. This fact, as the district court decided, conclusively establishes that Alta Verde was a concentrated animal feeding operation, and thus a point source, at the time of the 1987 discharges because Alta Verde did not discharge *only* in the event of a 25–year, 24–hour storm event. In addition, the district court found that Alta Verde may discharge in the future, despite the improvements to its wastewater disposal system, as a result of a period of heavy rains not amounting to a 25–year, 24–hour rainfall event. The district court concluded that

> the evidence conclusively established that no 25–year, 24–hour rainfall event occurred in 1987 and that there were discharges from the feedlot. Thus, as of the time of those discharges, the feedlot was a concentrated animal feeding operation. Additionally, because the Court finds that the Defendant's Feedlot may discharge in the event of a future chronic rainfall event which does not reach the 25–year, 24–hour level, the Court is of the opinion that the Feedlot continues to come within the definition of concentrated animal feeding operation, and thus continues to be a point source under the Act and the regulations.

The district court based these findings on a careful review of the evidence and they are not clearly erroneous.

■■■ The district court concluded, however, that the applicable effluent limitation guidelines, based on BAT, provide an exception to the permit requirement. The guideline for concentrated animal feeding operations states that

> [p]rocess waste pollutants in the overflow may be discharged to navigable waters whenever rainfall events, either chronic or catastrophic, cause an overflow of process waste water from a facility designed, constructed, and operated to contain all process generated waste waters plus the runoff from a 25–year, 24–hour rainfall event for the location of the point source.

40 C.F.R. § 412.13(b). The district court correctly observed that this guideline requires a concentrated animal feeding operation to be designed, constructed, and operated to contain all process generated waste waters plus the runoff from a 25–year, 24–hour rainfall event. This requirement is one of the basic criteria for issuing a permit. It is not an exception to the permit requirement as the district court erroneously concluded.[3] The Administrator, in fact, does not have discretion under the Act to except classes of point sources from the permit requirement.[4] As the District of Columbia Circuit concluded in *Natural Resources Defense Council, Inc. v. Costle,*

> [t]he wording of the statute, legislative history, and precedents are clear: the EPA Administrator does not have authority to exempt categories of point sources from the permit requirements of § 402.

*Id.* at 1377. We conclude, therefore, that the district court erred by finding that the applicable effluent limitation guidelines provide an exception to the NPDES permit requirement.

**B. Standing**

The district court found that Alta Verde had not discharged (and therefore had not violated the Act) from the date that the plaintiffs filed suit until the date that Alta

---

**3.** A permit is not superfluous once a point source meets the applicable effluent limitation guidelines, as the district court appears to have assumed. The permit process allows the issuer to assure that the applicant meets any applicable water quality standards, treatment standards, or schedule of compliance standards in addition to the basic effluent limitations. 40 C.F.R. § 122.44 (1989); *City of Sarasota v. Environmental Protection Agency,* 813 F.2d 1106, 1109 n. 10 (11th Cir.1987).

**4.** The EPA did have discretion under the Act to define "concentrated animal feeding operations," and it exercised that discretion by excepting operations of less than a certain size, operations that do not discharge, and operations that discharge only in the event of a 25–year, 24–hour storm event. Alta Verde, however, as the district court concluded, met this definition.

Verde improved its wastewater disposal system to contain the runoff from a 25–year, 24–hour rainfall event. No violation of the Act was possible after that date, according to the district court, because Alta Verde was no longer subject to the NPDES permit requirement. The district court concluded, therefore, that the plaintiffs' alleged violations were wholly past and dismissed the suit for lack of standing under *Gwaltney of Smithfield Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). Because Alta Verde's failure to obtain a permit amounted to a continuing violation of the Act, and because any discharge as a result of a chronic rainfall event not amounting to a 25–year, 24–hour rainfall event will be an intermittent violation of the Act, we reverse.

In *Gwaltney,* the Supreme Court held that a plaintiff does not have standing to maintain a citizen suit for civil penalties under 33 U.S.C. § 1365 for wholly past violations of the Act. *Id.* at 64, 108 S.Ct. at 385. The Supreme Court reached this conclusion by construing the phrase "to be in violation" in § 1365. That section states in pertinent part:

> [A]ny citizen may commence a civil action on his own behalf—
>
> (1) against any person ... who is *alleged to be in violation* of (A) an effluent standard or limitation. . . .

33 U.S.C. § 1365(a) (emphasis added). The Supreme Court concluded that Congress' use of the present tense indicated that citizens, unlike the Administrator, may not maintain a suit for civil penalties unless brought in a suit "to enjoin or otherwise abate an ongoing violation." *Gwaltney,* 484 U.S. at 59, 108 S.Ct. at 382.

■ In order to establish standing for a citizen suit, the plaintiff must "make a good-faith allegation of continuous or intermittent violation." *Id.* at 64, 108 S.Ct. at 385. The defendant can challenge the factual basis for this allegation by moving for summary judgment. *Id.* at 66, 108 S.Ct. at 385. On motion for summary judgment, the defendant must prove that the plaintiff's allegations of a continuous or inter-

mittent violation do not raise a genuine issue of material fact. *Id.* If the case proceeds to trial, however, "the plaintiff must prove the allegations," not "as a threshold matter in order to invoke the District Court's jurisdiction," but "in order to prevail" in "a trial on the merits." *Id.* In other words, the defendant has the burden at the summary judgment stage to demonstrate that the plaintiff's allegations of a continuous or intermittent violation do not raise a genuine issue of material fact. If the action proceeds to trial on the merits, however, the plaintiff must prove a continuous or intermittent violation as an element of the plaintiff's cause of action.

■ As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction. As explained in Justice Scalia's concurrence:

> It does not suffice to defeat subject matter jurisdiction that the success of the attempted remedies becomes clear months or even weeks after the suit is filed. Subject matter jurisdiction "depends on the state of things at the time of the action brought"; if it existed when the suit was brought, "subsequent events" cannot "oust[ ]" the court of jurisdiction.

*Gwaltney,* 484 U.S. at 69, 108 S.Ct. at 387 (Scalia J., concurring) (quoting *Mullen v. Torrance,* 9 Wheat. 537, 539, 6 L.Ed. 154 (1824)); *see also Smith v. Sperling,* 354 U.S. 91, 93 n. 1, 77 S.Ct. 1112, 1113 n. 1, 1 L.Ed.2d 1205 (1957) ("jurisdiction is tested by the facts as they existed when the action is brought"); *St. Paul Mercury Indemnity Co. v. Red Cab Co.,* 303 U.S. 283, 289–90, 58 S.Ct. 586, 590–91, 82 L.Ed. 845 (1938) ("Events occurring subsequent to the institution of suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction.").

■ The defendant's compliance with the Act subsequent to the filing of the complaint, however, may moot the case. *Gwaltney,* 484 U.S. at 66, 108 S.Ct. at 386 (the mootness doctrine "prevent[s] the

maintenance of suit when there is no reasonable expectation that the wrong will be repeated") (citations and quotation marks omitted); *Rosado v. Wyman*, 397 U.S. 397, 404, 90 S.Ct. 1207, 1213, 25 L.Ed.2d 442 (1970) ("mootness, frequently a matter beyond the control of the parties, may not occur until after substantial time and energy have been expended looking toward the resolution of a dispute that plaintiffs were entitled to bring in a federal court"). The defendant's mere "[v]oluntary cessation of allegedly illegal conduct," however, "does not make the case moot." *United States v. W.T. Grant Co.*, 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). As the *Gwaltney* Court noted:

> In seeking to have a case dismissed as moot, ... the defendant's burden "is a heavy one." The defendant must demonstrate that it is *"absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." Mootness doctrine thus protects defendants from the maintenance of suit under the Clean Air Act based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanction by predictable "protestations of repentance and reform."

*Gwaltney*, 484 U.S. at 66, 108 S.Ct. at 386 (quoting *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. at 897) (citations omitted).

On remand in *Gwaltney*, the Fourth Circuit established a two-part test to determine when a plaintiff has proved a continuous or intermittent violation at trial. According to the Fourth Circuit, a plaintiff can prove an ongoing violation at trial either

(1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.

*Gwaltney*, 890 F.2d 690, 693 (4th Cir.1989). The district court in the instant case adopted this test, as do we, and as has every court thus far to consider the question.

Although the district court found that no discharges occurred on or after the date the complaint was filed, it did find that the plaintiffs "adduced evidence from which a reasonable trier of fact could find a likelihood of a recurrence in intermittent or sporadic discharges from the Feedlot." The district court concluded, however, that the plaintiffs lacked standing "[b]ecause no violations of the Act have occurred from the date of the complaint until [the date of trial], and because no violations will occur in the future."

The district court did not find "violations that continue on or after the date the complaint is filed" because no discharges occurred after 1987. The court did not consider whether Alta Verde's failure to obtain a permit amounted to a continuing violation of the Act because it erroneously concluded that the EPA's effluent limitations guidelines create an exception to the Act's permit requirement. Because Alta Verde's failure to obtain an NPDES permit was and is a violation of the Act, we conclude that the plaintiffs proved a continuing violation.

By distinguishing "to be in violation" from "to have violated," the Supreme Court in *Gwaltney* construed the Act to permit citizen suits against polluters who remain in a state of violation. Justice Scalia explicitly drew this distinction in his concurrence. He reasoned:

> The phrase in § 505(a), "to be in violation," unlike the phrase "to be violating" or "to have committed a violation," suggests a state rather than an act—the opposite of a state of compliance.... When a company has violated an effluent standard or limitation, it remains, for purposes of § 505(a), "in violation" of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate the cause of the violation.

484 U.S. at 69, 108 S.Ct. at 387 (Scalia J., concurring). A concentrated animal feeding operation that violates the Act by discharging without a permit, we conclude, remains in a continuing state of violation until it either obtains a permit or no longer meets the definition of a point source. By demonstrating that Alta Verde is a point source and does not have an NPDES permit, the plaintiffs met the first prong of the Fourth Circuit's *Gwaltney* test by proving "violations that continue on or after the date the complaint is filed." *Gwaltney*, 890 F.2d at 693.

The plaintiffs also proved the continuing "likelihood of recurrence in intermittent or sporadic violations"—the second prong of the *Gwaltney* test. The district court found the reasonable likelihood of intermittent or sporadic discharges, but concluded that such discharges would not violate the Act because Alta Verde had improved its wastewater disposal system to contain the runoff from a 25–year, 24–hour rainfall event. The district court reasoned:

> [T]here is almost no possibility of a discharge in the future at the Feedlot, except in the event of a catastrophic or a chronic rainfall event. Because the Feedlot will now and in the future almost certainly hold the runoff from a 25–year, 24–hour event, discharges in the event of a catastrophic or chronic rainfall is not a violation of the Act.

In other words, a discharge resulting from a rainy period in which no single storm amounts to a 25–year, 24–hour rainfall event will not violate the Act because Alta Verde, subsequent to the complaint, improved its wastewater disposal system to meet the effluent limitation guidelines standard for concentrated animal feeding operations.

As noted above, however, those guidelines set the standard for issuing permits rather than create an exception to the per-mit requirement. In findings that were not clearly erroneous, the district court concluded that Alta Verde "may discharge in the event of a future chronic rainfall event which does not reach the 25–year, 24–hour level," and that "a reasonable trier of fact could find a likelihood of a recurrence in intermittent or sporadic discharges from the Feedlot." Such "[i]ntermittent or sporadic violations," the Fourth Circuit observed, "do not cease to be ongoing until the date when there is no real likelihood of repetition." *Gwaltney*, 890 F.2d 690, 693 (4th Cir.1989). Because any such discharge without a permit will violate the Act, we conclude that the plaintiffs satisfied the *Gwaltney* test's second prong by proving "a continuing likelihood of recurrence in intermittent or sporadic violations." *Id.* ; *Environmental Protection Agency v. California ex rel. State Water Resources Control Bd.*, 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976) ("it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms").

■■■ The district court also erred by dismissing the suit after trial for lack of standing. The Supreme Court in *Gwaltney* stated that if the matter proceeds to a trial on the merits, the plaintiff does not have to prove a continuous or intermittent violation "as a threshold matter in order to invoke the District Court's jurisdiction," but "must prove the allegations in order to prevail." *Gwaltney*, 484 U.S. at 66, 108 S.Ct. at 386. In other words, proof of a continuous or intermittent violation becomes an element of the plaintiff's cause of action.[5]

Apparently as a result of this error, the district court applied an incorrect standard. The district court found that "a reasonable trier of fact could find a likelihood of a recurrence in intermittent or sporadic discharges from the Feedlot."[6] This stan-

---

**5.** Apparently as a result of this error, the district court "dismissed" the case rather than simply entering judgment for defendants on the merits.

**6.** The district court may have erred simply because it quoted the Fourth Circuit's language on remand in *Gwaltney* too exactly. 890 F.2d at

693. The Fourth Circuit stated that a plaintiff can prove an ongoing violation at trial "by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of recurrence in intermittent or sporadic violations." This statement, however, refers to the type of evidence that the plaintiff must adduce

dard would have been correct had the defendant challenged the plaintiffs' standing on a motion for summary judgment. On summary judgment, the district court would have been required to resolve the strictly legal question of what a reasonable trier of fact might find. After the matter proceeded to trial, however, the question was not what a reasonable trier of fact might find, but what the district court, as the trier of fact, actually found.[7] In other words, the district court decided only that such a finding would be reasonable rather than actually deciding the issue based on a preponderance of the evidence.

The district court's error, however, was harmless in the instant case. The district court's conclusion that a "reasonable trier of fact" might have found "a likelihood of a recurrence in intermittent or sporadic discharges from the Feedlot," standing alone, would not have sufficed as a finding that plaintiffs actually proved the likelihood of intermittent or sporadic discharges. The district court also concluded, however, that Alta Verde continues to be a point source because it may continue to discharge "in the event of a future chronic rainfall event which does not reach the 25–year, 24–hour level." This conclusion amounts to a specific finding that Alta Verde may continue to discharge in intermittent or sporadic episodes.

The district court also applied an incorrect standard when it concluded that Alta Verde's compliance with the Act *subsequent to the complaint* deprived the plaintiffs of standing.[8] Oddly, the district court begins by citing the correct standard. Relying on the Fourth Circuit's test in *Gwaltney*, the district court states that "[i]n order to maintain its suit under § 1365, the Plaintiff must prove at trial that an 'ongoing violation' exists *at the time of the complaint*." (Emphasis added). Nevertheless, the district court concluded that

and not the kind of finding that the trier of fact must make. The Fourth Circuit hardly could have meant that the trier of fact must make a finding on what a trier of fact might find. It meant only that the plaintiff must prove this element of his case with evidence from which "a reasonable trier of fact" could reach such a conclusion. Unless the plaintiff adduces such evidence, the defendant is entitled to judgment notwithstanding the verdict.

7. The district court also stated that *Gwaltney* had not placed the burden clearly on either plaintiffs or defendants to show a continuing likelihood of recurrence in intermittent or sporadic violations. Both the Supreme Court and the Fourth Circuit on remand, however, clearly placed the burden on the plaintiff to prove *at trial* his allegations of a continuing or intermittent violation. The district court was confused, apparently, because the defendant has the burden to demonstrate that no genuine issue of material fact exists on the standing question if the defendant challenges standing on a motion for summary judgment. The defendant also has the burden of proof if he asserts that his compliance with the Act subsequent to the complaint moots the action. *Gwaltney*, 484 U.S. at 66, 108 S.Ct. at 386.

8. Alta Verde argues that although an ongoing violation must be proved at the time of the complaint for purposes of standing, some uncertainty exists concerning the appropriate time for determining an ongoing violation as an element of the plaintiff's cause of action. The plaintiff should be required to prove an ongoing violation at the time of trial, Alta Verde argues, if the action proceeds to a trial on the merits.

On remand in *Gwaltney*, however, the Fourth Circuit concluded that the plaintiff must prove at trial an ongoing violation "at the time suit was brought." *Gwaltney*, 890 F.2d 690, 693 (4th Cir.1989) ("The question is whether, at the time suit was brought, there was a reasonable likelihood that this past polluter would continue to pollute in the future."); *see also Sierra Club v. Union Oil Co. of California*, 853 F.2d 667, 671 (9th Cir.1988) (" 'the district court may wish to consider ... any other evidence presented during the proceedings that bears on whether the risk of defendant's continued violation had been completely eradicated when citizen-plaintiffs filed suit' ") (quoting *Gwaltney*, 844 F.2d 170 at 171–72); *Atlantic States Legal Foundation v. Tyson Foods*, 897 F.2d 1128, 1134 (11th Cir.1990) ("we find that for purposes of assessing a plaintiff's allegations of ongoing violations, the court must always look to the date the complaint was filed"). The Fourth Circuit's conclusion is also consistent with the Supreme Court's statement in *Gwaltney* that if "the case proceeds to trial on the merits ... the plaintiff must prove the allegations in order to prevail." 484 U.S. at 66, 108 S.Ct. at 386. The allegations to which the Supreme Court refers are the plaintiff's allegations of an ongoing violation *at the time of the complaint* for purposes of demonstrating standing. The most natural reading of this statement is that the Supreme Court intended for the plaintiff to prove these same allegations at trial.

Alta Verde's improvements to its feedlot *subsequent to the complaint* deprived the plaintiffs of standing.[9]

▆▆▆▆▆ The district court apparently confused the Supreme Court's dicta on mootness in *Gwaltney* with its holding on standing. A suit may be dismissed because the defendant complies with the Act *subsequent to the complaint* if the defendant's compliance moots the action.[10] *Gwaltney*, 484 U.S. at 66, 108 S.Ct. at 386. In order to prove mootness, however, the defendant must adduce evidence from which it is " '*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.' " *Id.* (quoting *United States v. Concentrated Phos-phate Export Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968)). Alta Verde cannot meet this "heavy burden," however, because "the Defendant's Feedlot may discharge in the event of a future chronic rainfall event which does not reach the 25–year, 24–hour level." [11] Alta Verde, therefore, did not make "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." [12] Because Alta Verde's improvements to its wastewater disposal system neither mooted the plaintiffs' action nor excepted Alta Verde from the NPDES permit requirement, we conclude that the plaintiffs met both prongs of the Fourth Circuit's test for a continuous or intermittent violation.

As of the date of trial, the EPA had taken no action on Alta Verde's permit application. Although Alta Verde stated in its permit application that "it was not a concentrated animal feeding operation which results in a discharge to waters of the U.S.," the district court found just the opposite.

Alta Verde contends on appeal that this application for a permit mooted the action. The plaintiffs' action for civil penalties clearly is not mooted, however, and an injunction ordering Alta Verde to pursue issuance of the permit with all due diligence and to comply with the Act's requirement until such time as a permit issues might well be appropriate. The standard for proving mootness is exacting and the mere application for a permit does not prove that the suit was "based solely on violations wholly unconnected to any present or future wrongdoing." *Gwaltney*, 484 U.S. at 67, 108 S.Ct. at 386.

9. Even had the improvements mooted the plaintiffs' action for injunctive relief, it would not necessarily have mooted the plaintiffs' action for civil penalties. In *Powell v. McCormack,* the Supreme Court observed:
> Where several forms of relief are requested and one of these requests subsequently becomes moot, the Court has still considered the remaining requests.... [T]he remaining live issues supply the constitutional requirement of a case or controversy.

*Powell v. McCormack,* 395 U.S. 486, 496–97 n. 8, 89 S.Ct. 1944, 1950–51 n. 8, 23 L.Ed.2d 491 (1969) (citations omitted). The Eleventh and the Fourth Circuits, we note, have decided that compliance with the Act subsequent to filing the complaint does not moot a citizen's action for civil penalties. *See Gwaltney,* 890 F.2d 690, 696 (1989) ("In our view, the penalty factor keeps the controversy alive between plaintiffs and defendants in a citizen suit, even though the defendant has come into compliance and even though the ultimate judicial remedy is the imposition of civil penalties assessed for past acts of pollution."); *Atlantic States Legal Foundation Inc. v. Tyson Foods Inc.,* 897 F.2d 1128, 1135 (11th Cir.1990) ("[T]he mooting of injunctive relief does not moot the request for civil penalties as long as such penalties were rightfully sought at the time the suit was filed."). We need not and do not decide this question, however, because the defendants in the instant case failed to meet their burden of proving mootness.

10. We do not hold that the district court could not consider evidence of the defendant's improvements to the feedlot that began prior to the complaint and that were completed before trial. Such improvements were relevant, however, only on the question of mootness.

11. Approximately a year and a half after plaintiffs filed suit, and two months before trial, Alta Verde submitted an application for a permit.

12. In their Reply to Appellant's Motion for Rehearing, Alta Verde argues that the plaintiffs should not be heard to argue that the applicable date for determining the likelihood of a violation is the filing of the complaint. According to Alta Verde, the plaintiffs did not offer evidence of the likelihood of a violation on the date the lawsuit was filed on December 14, 1987 because their expert performed his study in November of 1988. Alta Verde fails to understand the legal standard at issue. The plaintiffs were not limited, as Alta Verde implies, to presenting evidence of the likelihood of a discharge on the specific day that they filed suit. The issue is whether the plaintiff proved that the defendant continued to violate the Act subsequent to the complaint, or was likely to violate the Act intermittently. Evidence of the likelihood of a discharge at any time subsequent to the complaint is probative of this question, and proof of an actual violation subsequent to the complaint is conclusive.

### III. CONCLUSION

For the foregoing reasons, we reverse the district court's dismissal and remand for further proceedings consistent with this opinion.

REVERSED AND REMANDED.