CHESAPEAKE BAY FOUNDATION, INC.; Natural Resources Defense Council, Inc., Plaintiffs–Appellees,

v.

GWALTNEY OF SMITHFIELD, LTD., Defendant–Appellant.

No. 88–1317.

United States Court of Appeals, Fourth Circuit.

Argued March 8, 1989.

Decided Nov. 30, 1989.

E. Barrett Prettyman, Jr. (Patrick M. Raher, John G. Roberts, Jr., Catherine J. LaCroix, Hogan & Hartson, Washington, D.C., Anthony F. Troy, George A. Somerville, Mays & Valentine, Richmond, Va., on brief), for defendant-appellant.

James Kevin Thornton (James F. Simon, Natural Resources Defense Council, Inc., Patrick M. McSweeney, McSweeney, Burtch & Crump, Richmond, Va., Ann Powers, Chesapeake Bay Foundation, Inc., Annapolis, Md., on brief), for plaintiffs-appellees.

Before RUSSELL and SPROUSE, Circuit Judges, and KAUFMAN, Senior District Court Judge for the District of Maryland, sitting by designation.

SPROUSE, Circuit Judge:

This case, a frequent visitor in this court, continues to present serious issues concerning the interpretation of § 505 of the Clean Water Act (the Act). Gwaltney of Smithfield, Ltd. (Gwaltney), appeals the finding of the district court that plaintiffs-appellees Chesapeake Bay Foundation, Inc. (CBF), and Natural Resources Defense Council, Inc. (NRDC), proved ongoing violations by Gwaltney at the time suit was brought. Gwaltney also raises standing and mootness objections to this action. We affirm in part and reverse in part.

I

*Facts and Procedural History*

The original action was brought by CBF [1] under the citizen suit provisions of 33 U.S.C. § 1365 (§ 505 of the Act). CBF based its claims on violations by Gwaltney of its National Pollutant Discharge Elimination System (NPDES) permit, and requested both injunctive relief and civil penalties under 33 U.S.C. §§ 1365(a) and 1319(d) (§§ 505(a) and 309(d) of the Act). The district court found that CBF had standing to bring the suit, that the court had subject matter jurisdiction, and that Gwaltney was liable for its violations. *Chesapeake Bay Foundation v. Gwaltney of Smithfield, Ltd.,* 611 F.Supp. 1542 (E.D. Va.1985). Using the Environmental Protection Agency Civil Penalty Policy as a guideline, the court imposed upon Gwaltney a civil penalty of $1,285,322, with interest, of which $289,822 was for violations of Gwaltney's total Kjeldahl nitrogen (TKN) limit, and $995,500 was for violations of the chlorine limit.[2] *Id.* at 1565.

Gwaltney appealed to this court, challenging the district court's subject matter jurisdiction and its method of calculating penalties. The facts affecting the first issue were largely undisputed, but the parties disagreed on the application of the statute to the facts. Gwaltney reported more than 150 violations of its NPDES permit between 1981 and 1984, the last violation occurring on May 15, 1984. The two environmental groups had sent notice of intent to sue in February 1984, and filed suit on June 15, 1984, one month after Gwaltney's last recorded violation. The Act permits citizen suits against any person "who is alleged to be in violation" of NPDES permit limitations, 33 U.S.C. § 1365(a); Gwaltney contended this meant there must be continuing violations at the time of suit in order for the court to have jurisdiction. We found that the statute, although ambiguous, also conferred jurisdiction for citizen suits based on wholly

past violations, and so affirmed the district court without reaching the question of whether CBF had made a good-faith allegation of ongoing violations. *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 791 F.2d 304, 308 n. 9, 316–17 (4th Cir.1986). We also affirmed the district court with regard to its methodology for assessing penalties.

The United States Supreme Court granted certiorari on the issue of jurisdiction in order to resolve a split among the circuits and subsequently held that § 1365(a) does not permit citizen suits for wholly past violations. It remanded the case to us to consider whether CBF's complaint had made a good-faith allegation of ongoing violations, holding that such allegation would be sufficient to establish subject matter jurisdiction. *Gwaltney of Smithfield v. Chesapeake Bay Foundation,* 484 U.S. 49, 108 S.Ct. 376, 384–85, 98 L.Ed.2d 306 (1987). The district court, in its initial consideration, had suggested as an alternative holding that CBF had made sufficient good faith allegations of continuing violations to establish jurisdiction. 611 F.Supp. at 1549 n. 8. On remand from the Supreme Court, we held that this finding was not clearly erroneous, and remanded the case to the district court "for further findings as to whether, on the merits, plaintiffs proved at trial an ongoing violation." *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.,* 844 F.2d 170, 171 (4th Cir.1988).

After remand to the district court, Gwaltney again challenged the subject matter jurisdiction of the court, moving to dismiss the case as moot and, alternatively, to dismiss because the plaintiffs did not have standing. Gwaltney also asserted that even if the court did have jurisdiction to hear the case, it did not have jurisdiction as to Gwaltney's chlorine violations, because no reasonable person could in good faith allege that the chlorine violations were ongoing at the time of trial. Finally, Gwaltney asserted that CBF had failed to meet its burden of proving that there were ongo-

---

**1.** Throughout this opinion, "CBF" will refer to both CBF and NRDC.

**2.** The district court did not grant the injunction, nor did its opinion give a rationale for not

doing so. However, in a later proceeding, Judge Merhige explained that he was reluctant to enjoin people to do what the law requires them to do.

ing violations, even of TKN, at the time of trial.

The district court interpreted our mandate to foreclose any consideration of mootness, standing, or severability of the chlorine and TKN violations, instructing it *only* to determine whether CBF had proved ongoing violations. Finding that CBF had done so, the court reinstated its original judgment of $1,285,322 in civil penalties. *Chesapeake Bay Foundation, Inc. v. Gwaltney of Smithfield, Ltd.*, 688 F.Supp. 1078, 1080 (E.D.Va.1988).

Gwaltney now appeals to this court, claiming there was insufficient evidence to support the district court's finding of ongoing violations. Gwaltney claims that even if there was sufficient evidence the district court erred in reinstating penalties for chlorine as well as TKN violations. Gwaltney also appeals on the standing and mootness issues. Normally, because they are jurisdictional, we would consider the standing and mootness questions first. In this case, however, the jurisdictional issues are intertwined with the finding of ongoing violations; therefore, we address the substantive dispute first.

## II

### *Whether There Was An Ongoing Violation*

■ Gwaltney asserts that the district court erred in finding that there was an ongoing violation at the time suit was brought. As we now know, essentially the last violation occurred on May 15, 1984.[3] Gwaltney claims that at the remand hearing the district court should have considered the evidence of its compliance since that time. Gwaltney also asserts that there was not sufficient evidence adduced at the time of trial to permit a finding of ongoing violation.

In its opinion in this case, the Supreme Court stated that, at trial, the citizen-plaintiff must prove its allegations of ongoing violation in order to prevail. *Id.* 108 S.Ct. at 386. The Court defined a § 1365 ongoing violation to be "a reasonable likelihood that a past polluter will continue to pollute in the future." 108 S.Ct. 381. In our remand to the district court, we instructed that the citizen-plaintiffs could prove an ongoing violation

> either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition....
>
> .... [T]he district court may wish to consider whether remedial actions were taken to cure violations, the *ex ante* probability that such remedial measures would be effective, and any other evidence presented during the proceedings that bears on whether the risk of defendant's continued violation had been completely eradicated when citizen-plaintiffs filed suit.

844 F.2d at 171–72.

There is no doubt that Gwaltney was a past polluter. Its discharge monitoring reports revealed violations in almost every month from the time Gwaltney purchased the plant in 1981 until one month before suit was filed.[4] The question is whether, at the time suit was brought, there was a reasonable likelihood that this past polluter would continue to pollute in the future.

Gwaltney points to its record of near-perfect compliance after May 15, 1984 as conclusive evidence that there was no ongoing violation at the time of trial. However, the proper point from which to assess the likeli-

---

3. Gwaltney exceeded its monthly average limitation for TKN in September 1985, apparently because of problem conditions resulting from a hurricane. Gwaltney claims the violation was "permissible" under 40 C.F.R. 122.42(n).

4. The history of violations at the location predated Gwaltney. Gwaltney acquired the plant from ITT–Gwaltney, which had committed numerous violations of its NPDES permit in 1980 and 1981. Gwaltney took over the obligations of the NPDES permit knowing that there were problems with the wastewater treatment system.

hood of continuing violations is not the present, with its advantage of hindsight, but the time of the original suit. That is, did CBF carry its burden at trial of proving ongoing violations, either by proving actual violations after the date of filing suit, or by proving a reasonable likelihood that intermittent or sporadic violations would recur at Gwaltney?

The testimony at trial showed the following. Gwaltney purchased the meat processing plant in October of 1981. In June of 1982, it hired a consulting engineer to design modifications so the wastewater treatment facility would adequately treat the plant waste. After various delays, a final plan was approved, and the modifications were completed in October of 1983. Nevertheless, violations of Gwaltney's TKN permit limitation occurred during the winter of 1983–84.

CBF sent notice of intention to sue in February 1984. The last violation of Gwaltney's permit occurred on May 15, 1984. CBF filed suit on June 15, 1984. Trial was held on December 19, 1984. CBF put on as its only witness Dr. Bruce A. Bell. Gwaltney put on, *inter alia*, the testimony of Mr. J. Willis Sneed. Both Dr. Bell and Mr. Sneed testified that a major factor leading to TKN violations is low water temperatures. Dr. Bell's testimony included the following:

Q. Do you have an opinion based upon your review of the records in this case and your visit to the Gwaltney facility, with regard to whether the Gwaltney facility will meet T.K.N. limits this winter?

A. Assuming we have a normally cold winter, I think it is unlikely that they will.

Q. What is the basis for those doubts?

A. Primarily the question of waste water temperature. They are still using surface aerators, which tend to act to cool the system. And the larger of the two anaerobic lagoons being used has not at this time, or as of a week ago, formed a grease cover over most of the lagoon. And that grease cover is needed to act as an insulating blanket during the cold temperatures.

Mr. Sneed testified that the primary cause of the TKN violations the previous winter had been the lack of an adequate grease cover on the anaerobic lagoon. At another point he testified as follows:

Q. Mr. Sneed, is adequate grease cover important to proper winter T.K.N. treatment of the plant?

A. On the anaerobic lagoon, yes.

Q. You were with us last week when we toured the facility, were you not?

A. Yes.

Q. Isn't it in fact true at that point in time, in December, the lower anaerobic lagoon did not have adequate grease cover?

A. Yes. Earlier in the summer time that lagoon was covered with grease. And that was what we expected would happen.

Quite frankly we were very surprised that that grease cover has deteriorated to this point, and we have since taken steps to accelerate the formation of that grease cover.

Q. Given the importance, as you mentioned before, of maintaining adequate grease cover, isn't there some doubt in your mind as to whether the Gwaltney facility would be in compliance with T.K.N. limits this winter?

A. Yes, we have.

Q. Isn't there some doubt? That is all I am asking.

A. Yes, Sir.

I think there is some doubt every year that you would expect the plant to go out of compliance at some time.

Thus, at the time of trial, there had been no violations at Gwaltney during the previous summer months, but there had been TKN violations during the previous winter due to an inadequate grease cover. The trial was held on the threshold of another winter, the parties' witnesses agreed that TKN violations were more likely to occur in the winter, there was testimony from both parties' witnesses that the grease cover on the anaerobic lagoon was at the time inadequate to protect against normal winter

temperatures, and both witnesses expressed doubt whether Gwaltney could stay in compliance with its TKN limitation through the winter.

There was other evidence adduced at the trial that would indicate recurring violations of the TKN limitation were likely. Dr. Bell expressed concerns about the configuration of the anaerobic lagoon, the use of surface aerators, and the unknown effect of storm water on the system. Dr. Bell and a Gwaltney witness, Mr. Terry L. Rettig, testified that there were problems with the laboratory procedures used at Gwaltney, which would have an adverse effect on Gwaltney's ability to properly assess the operational needs of its treatment facility. There also was evidence that proper wastewater treatment did not receive a high priority at Gwaltney.

Given all of the above, we think that "a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations." We therefore affirm the district court in so finding.

## III

### *Standing*

The Supreme Court set forth the elements of Article III standing in *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3325, 82 L.Ed.2d 556 (1984): "A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Gwaltney urges that CBF cannot demonstrate that its injury is "likely to be redressed by the requested relief." It argues that, since its permit violations had ceased at the time suit was filed, the only remedy available to CBF was an assessment of civil penalties against Gwaltney. Since civil penalties are paid into the United States Treasury, Gwaltney urges that such payments could not redress any injury to CBF. However, we already have

held that such payments are causally related to a citizen-plaintiff's injury and are therefore likely to redress that injury. *Sierra Club v. Simkins Indus., Inc.*, 847 F.2d 1109, *reh'g & reh'g en banc denied* (4th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989). *Simkins* involved a citizen suit against a polluter for failing to sample its discharge and file quarterly reports as required by its NPDES permit. In the appeal from judgment for the citizens, we said:

> [T]he judicial relief of civil penalties, even if payable only to the United States Department of the Treasury, is causally connected to a citizen-plaintiff's injury. Such penalties can be an important deterrence against future violations. [Plaintiffs] must show actual or threatened injury traceable to the wrong and a particularized interest in deterring violations of the Act, but once they have done so, the imposition of civil penalties is causally connected to the injury.

*Id.* at 1113 (footnote omitted).

Gwaltney argues that the case *sub judice* is factually distinguishable from *Simkins* because here the pollution occurred in the past while in *Simkins* the violation was an ongoing one. The attempted distinction fails, however, because the district court here on remand found, and we affirm, that Gwaltney's violations were ongoing.[5] Gwaltney argues alternatively that *Simkins* was wrongly decided and urges us to depart from its holding. This panel, of course, is not at liberty to casually deviate from our established precedent. *See, e.g., Caldwell v. Ogden Sea Transp., Inc.*, 618 F.2d 1037, 1041 (4th Cir.1980); *Doe v. Charleston Area Medical Center, Inc.*, 529 F.2d 638, 642 (4th Cir.1975). Furthermore, the cases Gwaltney cites as support for its position do not deal with statutes analogous to the Clean Water Act, in which Congress essentially has deputized citizens to represent the public interest as private

---

5. Note that, with a finding of ongoing violations, the district court could in its discretion grant an injunction. We do not read § 1365(a), however, to permit assessment of civil penalties *only* if the court also decides to enjoin the defendant. The latter remedy subjects the defendant to the possibility of criminal contempt. As was true in this case, a court might find such a harsh remedy unwarranted, at the same time believing the deterrent value of a civil penalty assessment to be justified.

attorneys general. *See Gwaltney,* 791 F.2d at 308.

## IV

### *Mootness*

Although this jurisdictional issue was not raised in the original trial or on appeal from that judgment and therefore was not specifically included in our order of remand, mootness may be raised at any stage of the proceedings. *See United States v. Munsingwear, Inc.,* 340 U.S. 36, 39, 71 S.Ct. 104, 106, 95 L.Ed. 36 (1950); *Southern Pac. Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 514, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Moreover, since the record in this respect is fully developed, nothing would be gained by another remand for an initial decision by the district court on this issue. We therefore consider Gwaltney's mootness contention and conclude that the case is not moot.

The Supreme Court's mootness doctrine is well summarized in *Cedar Coal Co. v. United Mine Workers,* 560 F.2d 1153 (4th Cir.1977), *cert. denied,* 434 U.S. 1047, 98 S.Ct. 893, 54 L.Ed.2d 798 (1978).

> [C]ourts are not empowered to decide moot questions or abstract propositions, but the exercise of judicial power depends upon the existence of a case or controversy. The suit must be definite and concrete, touching the legal relations of parties having adverse legal interests and be a real and substantial controversy admitting of specific relief through a decree of conclusive character as distinguished from an opinion of what the law would be upon a hypothetical statement of facts.

*Id.* at 1162 (paraphrasing *North Carolina v. Rice,* 404 U.S. 244, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971)).

■ The question here is whether litigation over penalties imposed for past violations which are linked with ongoing violations presents a live case or controversy, even though primary subject matter jurisdiction is based on alleged continuing violations. In our view, the penalty factor keeps the controversy alive between plaintiffs and defendants in a citizen suit, even though the defendant has come into compliance and even though the ultimate judicial remedy is the imposition of civil penalties assessed for past acts of pollution. This conclusion follows from the structure of both § 1319—authorizing actions by the government against polluters—and § 1365—permitting citizen suits.

It is well established that the simple cessation of illegal activity upon the filing of a complaint does not moot a case. *See, e.g., City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 (1982); *United States v. W.T. Grant Co.,* 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953). Under the Clean Water Act, civil penalties attach as of the date a permit violation occurs.[6] Liability is fixed by the happening of an event (discharge of effluent with an excessive burden of pollution) that occurred in the past. Thus, the initiation of § 1319 actions by the government can be based on wholly past violations, so that a suit seeking penalties is intrinsically incapable of being rendered moot by the polluter's corrective actions. See, for example, *United States v. ITT Rayonier, Inc.,* 627 F.2d 996, 1000 (9th Cir.1980), where the Ninth Circuit held that when the Environmental Protection Agency brings suit for injunctive relief and civil penalties under the Act, an appeal is not mooted even if injunctive relief becomes inappropriate.

A similar rationale governs our consideration of putative mootness arguably brought on by corrective action after a § 1365 citizen suit has been initiated. When the Supreme Court concluded in its *Gwaltney* decision that § 1365 permits citizens' actions against polluters while there are ongoing violations, the Court effectively approved the assessment of penalties based on past violations (the only possible

---

**6.** At the time of assessment of penalties in the case, the statute stated, "Any person who violates ... any permit condition or limitation ... shall be subject to a civil penalty not to exceed $10,000 per day of such violation." 33 U.S.C. § 1319(d). The statute has been amended to allow up to $25,000 per day.

basis for assessing a penalty). Assuming, then, proof of an ongoing violation, a citizen action, like a government action, cannot become moot once there is assessment of civil penalties, so long as the penalties are for past violations that were part of or which contiguously preceded the ongoing violations.

The Court in *Gwaltney* instructed that citizen suits are unavailable for violations "wholly unconnected with any present ... wrongdoing." 108 S.Ct. at 386. However, if the plaintiffs prove an ongoing violation at trial, the violations are related to present wrongdoing. Section 1319(d) of the Act states that any person who violates a permit condition *shall* be subject to a civil penalty. This language coupled with § 1365(a) indicates that, once an ongoing violation is shown, the court is virtually obligated to assess penalties. *Stoddard v. Western Carolina Regional Sewer Auth.,* 784 F.2d 1200, 1208 (4th Cir.1986).

We think the Supreme Court's dicta on mootness in its *Gwaltney* opinion supports our view. There the Court indicated that the issue of a permit violation may become moot if a defendant

> demonstrate[s] that it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur. Mootness doctrine thus protects defendants from the maintenance of suit under the Clean [Water] Act based solely on violations wholly unconnected to any present or future wrongdoing, while it also protects plaintiffs from defendants who seek to evade sanction by predictable protestations of repentance and reform.

108 S.Ct. at 386 (emphasis in original; quotation marks and citations omitted). The burden on the defendant—to prove that the issue has become moot because of corrective action it has taken—is a heavy one. Under the rationale of the *Gwaltney* dicta, whether corrective action moots the issue of an ongoing violation *vel non* is a factual question. Conceptually, a myriad of factual questions could be posed in this context. *See* Note, *Clean Water Citizen Suits after Gwaltney: Applying Mootness Principles in Private Enforcement Actions,* 4 Fla.St. U.L.Rev. 143, 158–59 (1988) (authored by Reed Benson). Here, however, we need not speculate—the district court has found as a matter of fact that Gwaltney's violations were ongoing as that term is explained in the Supreme Court's *Gwaltney* decision. As we have explained, that finding is not clearly erroneous, and it shapes the dimensions of this case on appeal. The district court's judgment was based on its conclusion that Gwaltney was guilty of an ongoing violation at the time suit was filed, and the penalty levied against it was based, as it necessarily must be, on past violations. It is both the ongoing nature of the violation and CBF's interest as a private attorney general seeking a remedy for that violation that presents a live controversy in the Article III context.

V

*Bifurcation of the TKN and Chlorine Violations*

■ Our remand instructed the district court to determine whether there had been an ongoing violation at Gwaltney at the time of trial. At the remand hearing, Gwaltney urged that the court should make separate determinations for the TKN and chlorine violations. The court, interpreting our remand quite strictly, deemed it was permitted only to determine whether there was an ongoing violation; finding that there was, the court then reinstated the original judgment, which was based on both TKN and chlorine violations. We reverse.

It is "absolutely clear" that there were no ongoing chlorine violations at the time this suit was brought. Gwaltney had installed new chlorination equipment in March of 1982, had made further modifications over the summer, and had experienced no violations of its chlorine limitations since October of 1982. Clearly Gwaltney had abated its chlorine problems by the time CBF filed suit in June of 1984. Had Gwaltney violated no other permit parameters, the court would have had no subject matter jurisdiction over this suit. *Gwaltney,* 108 S.Ct. at 384–85.

However, Gwaltney did violate other parameters, including the TKN violations which were ongoing at the time suit was filed, and CBF seeks to use that fact to justify imposition of penalties for the chlorine violations. CBF contends that the jurisdictional requirement of § 1365 refers to finding an ongoing violation of the *permit;* having done so, the court may then impose penalties for any past violation of any permit *parameter.* We do not think the statutory language can support that position. Section 1365(a) permits citizen suits against persons alleged to be in violation of "an effluent standard or limitation." Penalties under § 1319(d) may be assessed for violations of "any permit condition or limitation." The entire structure of the Clean Water Act and regulations involves identifying specific pollutants and setting a permit limit for each pollutant of concern. It thus makes sense within this scheme to view each parameter separately for purposes both of determining ongoing violation and of assessing penalties.[7]

CBF's theory also runs against the reasoning of the Supreme Court in finding that there must be an ongoing violation to create subject-matter jurisdiction. If Congress wished to permit citizen suits only when a discharger fails to abate a problem and the government fails to take enforcement action, *see* 108 S.Ct. at 382–83, then it would make little sense to permit penalties for wholly past violations of one parameter simply because there are ongoing violations of another parameter. The chlorine and TKN problems were due to distinct equipment and operational failures, and were corrected by distinct engineering solutions. While it was questionable at the time of suit whether Gwaltney had corrected its TKN violations, it was clear the company had abated its chlorine violations.

We therefore hold that the district court had no jurisdiction to impose penalties for Gwaltney's wholly past chlorine violations.

We vacate the judgment for $1,285,322 and remand for the court to enter judgment against Gwaltney in the amount of $289,822—the amount attributable to TKN violations—with interest.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.

7. In 1987, Congress amended § 1319. Rather than allowing penalties of "$10,000 per day of *such* violation", the statute now allows "$25,000 per day for *each* violation." [Emphasis supplied.] Congress also added the provision that, "For purposes of this subsection, a single operational upset which leads to simultaneous violations of more than one pollutant parameter shall be treated as a single violation." This language indicates that Congress, at least as of 1987, intended that non-upset violations be treated on a parameter-by-parameter basis.