**CITY OF MOUNTAIN PARK, GEORGIA, Plaintiff,**

v.

**LAKESIDE AT ANSLEY, LLC, et al., Defendants.**

Civil Action No. 1:05–CV–2775–CAP.

United States District Court, N.D. Georgia, Atlanta Division.

April 15, 2008.

Holly Page Cole, Martin Arthur Shelton, Kevin L. Ward, Schulten Ward & Turner, LLP, Atlanta, GA, for Plaintiff.

Edward F. Preston, Timothy Marzine Tanner, Coleman Talley Newbern Kurrie Preston & Holland, Valdosta, GA, Jennifer Grandoff Cooper, Gambrell & Stolz, Steven Ryan Press, Baker Donelson, Bearman, Caldwell & Berkowitz, P.C., Patrick B. Moore, Shubhra R. Mashelkar, Weinberg Wheeler Hudgins Gunn & Dial, George E. Duncan, Jr., Jennifer C. Adair, Duncan & Adair, P.C., Atlanta, GA, for Defendants.

### ORDER

CHARLES A. PANNELL JR., District Judge.

This matter comes before the court on the motion for partial summary judgment by defendants Day Investments II, LLC ("Day II") and Peachtree Residential Properties, Inc. ("PRP") [Doc. No. 391].

### Facts

The City of Mountain Park, the plaintiff in this action, is located in North Fulton County and is built around two large lakes—Lake Cherful[1] and Garrett Lake. The lakes are fed by three main tributaries including the primary tributary, Rocky Creek, which is located at the upper end of Garrett Lake. Garrett Lake drains into Lake Cherful.

The plaintiff filed a complaint in this court on October 25, 2005, alleging that the

---

1. "Cherful" is not a misspelling: the lake is named for Cherokee and Fulton Counties, which it straddles.

defendants caused silt and sediment-laden water to be discharged into the two lakes and the surrounding wetlands (collectively, "the lakes"), in violation of §§ 301, 402, and 404 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342, and 1344.[2] Defendants Day II and PRP, the movants in the instant motion, owned and/or developed the Huntington Park and Huntington Estates subdivisions, which are upstream from the lakes. Mountain Park alleges that silt and sediment from the Huntington subdivisions contaminated the lakes during their development.

Day II was the owner of the lots now known as the Huntington subdivisions at various times between 2000 and 2006. Day II contracted with PRP to act as the developer of the section of its property now known as the Huntington Estates subdivision. Once the raw land was developed with infrastructure (roads, sewage, etc.), Day II sold the lots to various developers and home building contractors, including PRP. Day II sold its last residential lot in July 2003. It maintained ownership of the last remaining lot, the amenities area, until selling it to the subdivision homeowners association in November 2006. PRP sold its last lot in the Huntington subdivisions in June, 2004.

Day II and PRP now move the court for partial summary judgment, arguing that the court lacks subject matter jurisdiction over Mountain Park's Clean Water Act claims. Specifically, they argue that all alleged violations of the Clean Water Act occurred prior to the filing of the complaint, and are therefore barred under the Supreme Court's holding in *Gwaltney of Smithfield v. Chesapeake Bay Foundation*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987).

---

2. The plaintiff also alleged various state law causes of action which are not presently at issue.

## Legal Analysis

### I. Summary Judgment Standard

Summary judgment is proper when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. The movant carries the initial burden and must show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only when that burden has been met does the burden shift to the nonmoving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required "to go beyond the pleadings" and to present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56(e)). "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

### II. Jurisdiction Over the Plaintiff's CWA Claims

#### A. Clean Water Act Citizen Suits

Congress enacted the Clean Water Act ("CWA" or the "Act") in 1972 "to restore and maintain the chemical, physical, and

biological integrity" of the waters of the United States. 33 U.S.C. § 1251(a). The "cornerstone" and "fundamental premise" of the Clean Water Act is § 301, which prohibits all discharges of any pollutant except in compliance with specified provisions of the statute. 33 U.S.C. § 1311; *Southeast Alaska Conservation Council v. United States Army Corps of Engineers,* 486 F.3d 638, 645 (9th Cir.2007). Two permits referenced in § 301 are relevant in this case: National Pollutant Discharge Elimination System ("NPDES") permits under § 402 (33 U.S.C. § 1342) for the discharge of pollutants into the waters of the United States;[3] and permits under § 404 (33 U.S.C. § 1344) for the discharge of "dredged or fill material" into jurisdictional waters, including wetlands.

While enforcement of the Act typically falls to the federal government, § 505(a) of the Act permits private citizens to file suit to enforce the Act under certain circumstances. 33 U.S.C. § 1365(a). It provides that citizens[4] may file suit "against any person ... **who is alleged to be in violation of** ... an effluent standard or limitation under this Act...." *Id.* (emphasis added). What, exactly, does it mean "to be in violation of" the Act? This question has been a subject of much debate since the passage of the Act—particularly with respect to whether a defendant must currently be engaged in a polluting practice or, instead, whether jurisdiction lies for past practices that have ceased by the time the suit is filed. *Sierra Club v. El Paso Gold Mines,* 421 F.3d 1133, 1139 (10th Cir.2005). The Supreme Court took a step toward resolving the confusion with its opinion in *Gwaltney.*

### B. *Gwaltney*

Because this court's decision on the instant motion will depend heavily upon its interpretation of the Supreme Court's holding in *Gwaltney of Smithfield v. Chesapeake Bay Foundation,* that decision bears discussion in detail.

The defendant in *Gwaltney,* a meat-packing plant, repeatedly violated the conditions of its pollution discharge permit between 1981 and 1984. 484 U.S. at 53, 108 S.Ct. 376. In June 1984, two environmental group plaintiffs filed suit in the Eastern District of Virginia under § 505(a) alleging that the defendant had violated, and would continue to violate, the Act. The defendant moved to dismiss the case for lack of subject matter jurisdiction. The district court ruled that (1) § 505(a) authorizes citizens to bring enforcement actions based on wholly past violations, and (2) that even if it did not, the court would still have jurisdiction based on the plaintiffs' good faith allegations of continuing violations. The Fourth Circuit affirmed, agreeing with the district court's interpretation of § 505(a) as allowing citizen suits for past violations. It held that § 505(a) "can be read to comprehend unlawful conduct that occurred only *prior* to the filing of a lawsuit as well as unlawful conduct that continues into the present." *Id.* at 56, 108 S.Ct. 376 (quoting *Chesapeake Bay*

---

**3.** Pursuant to § 402(b), each State may establish and administer its own permit program if the program conforms to federal guidelines and is approved by the Administrator of the Environmental Protection Agency. § 1342(b). The Act calls for the Administrator to suspend the issuance of federal permits as to waters subject to an approved state program. § 1342(c)(1). The Georgia Environmental Protection Division ("EPD") administered the NPDES permit program governing the projects at issue in this case.

**4.** "Citizens," as used in § 505, is broadly defined to include any "person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). Municipalities such as the plaintiff are included within this definition.

*Foundation v. Gwaltney of Smithfield,* 791 F.2d 304, 309 (4th Cir.1986)).

Prior to the Fourth Circuit's ruling, the Fifth Circuit had ruled in *Hamker v. Diamond Shamrock Chemical Co.,* 756 F.2d 392 (5th Cir.1985), that the Act's "alleged to be in violation of" language mandated that private citizens could only bring suit against a defendant that was currently violating the Act at the time of the complaint. *Id.* at 395. After the Fourth Circuit's *Gwaltney* decision, the First Circuit adopted yet another construction of § 505(a). It held in *Pawtuxet Cove Marina, Inc. v. Ciba–Geigy Corp.,* 807 F.2d 1089 (1st Cir.1986), that jurisdiction lies under § 505(a) when "the citizen-plaintiff fairly alleges a continuing likelihood that the defendant, if not enjoined, will again proceed to violate the Act." *Id.* at 1094. The Supreme Court granted certiorari to resolve the three-way circuit split.

Acknowledging that the "to be in violation" language of the Act was ambiguous, the Court noted that "[t]he most natural reading of 'to be in violation' is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation-that is, a reasonable likelihood that a past polluter will continue to pollute in the future." 484 U.S. at 57, 108 S.Ct. 376. The Court reasoned that the use of the present tense throughout the statutory language suggested that "the harm sought to be addressed by the citizen suit lies in the present or the future, not in the past." *Id.* at 59, 108 S.Ct. 376. Based on this reading, the Court held that § 505(a) does not permit citizen suits for "wholly past" violations. *Id.* at 64, 108 S.Ct. 376.

The court noted, however, that the bar on wholly past violations would not necessarily dispose of the plaintiffs' lawsuit: jurisdiction would lie if, as the district court noted, the plaintiff made a good faith allegation of a continuous or intermittent violation. The Court accordingly remanded the good-faith allegations issue to the Fourth Circuit for further consideration. *Id.* at 64, 108 S.Ct. 376.

The Court went on to reject the defendant's argument that plaintiffs must prove their allegations of ongoing noncompliance before jurisdiction attaches under § 505(a). Instead, the Court agreed with the Solicitor General that "Congress's use of the phrase 'alleged to be in violation' reflects a conscious sensitivity to the practical difficulties of detecting and proving chronic episodic violations of environmental standards." *Id.* at 65, 108 S.Ct. 376. Therefore, the Court held, jurisdiction attaches once the plaintiff makes an allegation of an ongoing violation that is sufficient to meet the good faith requirements of Rule 11 of the Federal Rules of Civil Procedure. *Id.* at 65–66, 108 S.Ct. 376.

On remand, the Fourth Circuit held that to comport with the Supreme Court's bar on wholly past violations, the plaintiff environmental groups could prove an ongoing violation

> either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition. . . .
>
> . . . . The district court may wish to consider whether remedial actions were taken to cure violations, the ex ante probability that such remedial measures would be effective, and any other evidence presented during the proceedings that bears on whether the risk of defendant's continued violation had been completely eradicated when citizen-plaintiffs filed suit.

*Chesapeake Bay Found. v. Gwaltney of Smithfield,* 844 F.2d 170, 172 (4th Cir. 1988). The plaintiffs' original claims in the case involved two different types of violations—exceeding the total Kjeldahl nitrogen (TKN) discharge limit and discharging excessive amounts of chlorine. The court found that the two violations had different causes and solutions and must therefore be analyzed separately. As to the TKN violation, the court found that the evidence showed that it was at least "questionable at the time of suit whether Gwaltney corrected its TKN violations. . . ." *Chesapeake Bay Foundation v. Gwaltney of Smithfield,* 890 F.2d 690, 697 (4th Cir.1989). The court based its finding largely on Gwaltney's own expert's testimony that he had "some doubt" that the plant could maintain compliance in the coming winter. *Id.* at 694–95. Based on this evidence, the court concluded that "a reasonable trier of fact could find a continuing likelihood of intermittent or sporadic violations," and that the district court therefore had jurisdiction over the TKN-related claims. *Id.* at 695.

As to the chlorine claims, however, the court observed that Gwaltney had installed new chlorination equipment in March of 1982, had made further modifications over that summer, and had experienced no violations of its chlorine discharge permit since October of 1982—two years before the suit was filed. Consequently, it held that it was "absolutely clear that there were no ongoing chlorine violations at the time [the] suit was brought" and that the district court therefore lacked jurisdiction to hear the plaintiffs' chlorine-related claims. *Id.* at 697.

## C. The Split Over Gwaltney's Application

Although the *Gwaltney* decision established CWA claims could not be brought based on "wholly past" violations, it did not define the point at which an "ongoing" violation becomes "wholly past." Answering this question is especially difficult in cases such as this one where the conduct that gave rise to the violation has ceased, but the effects continue. *El Paso Gold Mines,* 421 F.3d at 1139. The issue has split the lower courts. *See Wilson v. Amoco Corp.,* 33 F.Supp.2d 969, 975 (D.Wyo.1998) (noting split and citing examples of varying approaches).

Because the Eleventh Circuit has not directly ruled on the issue, this court is left to weigh the non-binding decisions of other courts in its analysis of the defendants' motion. Because cataloguing the hundreds of decisions interpreting the wholly past/ongoing violation conundrum would be impractical, the court will focus on representative examples of the varying approaches taken by the courts on the issue.

Some courts have taken a broad interpretation of what constitutes "ongoing" violations. For example, in the oft-cited case *North Carolina Wildlife Federation v. Woodbury,* No. 87–584–CIV–5, 1989 WL 106517, at *1–2, 1989 U.S. Dist. LEXIS 13915, at *1–5 (E.D.N.C. Apr. 25, 1989), the defendant mining companies had caused the discharge of fill material into a protected wetland, but had submitted undisputed affidavits showing that all such discharges had ceased some six years prior to the filing of the complaint. Thus, the defendants argued that the court lacked jurisdiction because any violations were "wholly past" under *Gwaltney.*

The plaintiffs responded that the defendants' failure to remove the previously discharged material constituted a continuing violation under the CWA, and the court agreed. It held that "the failure to take remedial measures as a continuing violation is eminently reasonable. This is because it is not the physical act of discharging dredge wastes itself that leads to the injury giving rise to citizen standing, but

the consequences of the discharge in terms of lasting environmental degradation." *Id.* at *2, 1989 U.S. Dist. LEXIS 13915, at *6. The court cited Justice Scalia's concurrence in *Gwaltney,* which reads, in part:

> The phrase in § 505(a), "to be in violation," unlike the phrase "to be violating" or "to have committed a violation," suggests a state rather than an act—the opposite of a state of compliance. A good or lucky day is not a state of compliance. Nor is the dubious state in which a past effluent problem is not recurring at the moment but the cause of that problem has not been completely and clearly eradicated. **When a company has violated an effluent standard or limitation, it remains, for purposes of § 505(a), "in violation" of that standard or limitation so long as it has not put in place remedial measures that clearly eliminate the cause of the violation.**

*Gwaltney,* 484 U.S. at 69, 108 S.Ct. 376 (Scalia, J., concurring) (emphasis added). The *Woodbury* court concluded by noting that the defendants' suggested interpretation of *Gwaltney* would subvert the intent of the Clean Water Act:

> If citizens suits were barred merely because any illegal ditching and drainage of a wetland tract was completed before it might reasonably be discovered, violators would have a powerful incentive to conceal their activities from public and private scrutiny—which would lead to serious problems in public and private enforcement of the Clean Water Act.

1989 WL 106517, at *3, 1989 U.S. Dist. LEXIS 13915, at *8.

Other courts in cases involving illegally discharged fill materials have reached similar conclusions. *See, e.g., Sasser v. EPA,* 990 F.2d 127, 129 (4th Cir.1993) ("Each day the pollutant remains in the wetlands without a permit constitutes an additional day of violation."); *Informed Citizens United, Inc. v. USX Corp.,* 36 F.Supp.2d 375, 377–78 (S.D.Tex.1999); *United States v. Reaves,* 923 F.Supp. 1530, 1534 (M.D.Fla.1996).

A separate line of cases, however, has read the "wholly past" language of *Gwaltney* more stringently and held that past violations—whatever the continuing consequences—cannot form the basis of CWA citizen suits. For example, in *Connecticut Coastal Fishermen's Association v. Remington Arms Co.,* 989 F.2d 1305 (2d Cir. 1993), the plaintiffs alleged that the defendant's shooting range was discharging pollutants—lead shot and clay target debris— into Long Island Sound without a pollution discharge permit in violation of § 402 of the Act. Alternatively, the plaintiffs argued that the deposit of shot and targets into the Sound constituted the discharge of fill material in violation of § 404. The defendant responded that it had completely ceased operation of the shooting range months before the plaintiff filed suit in April 1987. While the plaintiffs admitted that the discharges had in fact stopped by the time of their complaint, they argued that there was no guarantee the pollution would not resume at a later date, and that they were therefore able to make a good faith allegation of a continuing violation under *Gwaltney.* The plaintiff also amended its complaint to allege that the previously deposited lead shot was itself a point source discharging pollutants as it dissolved. *Id.* at 1311–13.

The Second Circuit held that the plaintiff's complaint must be dismissed for lack of subject matter jurisdiction under *Gwaltney.* The court noted that the defendant had persuasively shown that it made a "final irrevocable decision" never to reopen the shooting range after being ordered by a state environmental agency order to cease all discharges of lead shot by December 31, 1986. The plaintiff had

offered no evidence to counter the defendant's showing other than repeating the allegations of its complaint. *Id.* at 1312 (citing *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (holding that a plaintiff must demonstrate more than "some metaphysical doubt as to the material facts" to defeat summary judgment)). The *Remington* court also rejected the plaintiff's argument that the already-deposited lead constituted an ongoing violation, reasoning that "[t]he present violation requirement of the Act would be completely undermined if a violation included the mere decomposition of pollutants." *Id.* at 1313.

Other decisions applying the same line of reasoning include *Coon v. Willet Dairy, LP*, Nos. 5:02–CV–1195 and 5:04–CV–917, 2007 WL 2071746, at *2–3, 2007 U.S. Dist. LEXIS 51718, at *6 (N.D.N.Y. July 17, 2007) (dismissing CWA claims because the defendant had entered into a consent order with the state environmental agency prior to the lawsuit, and the plaintiffs presented no evidence that the violation was ongoing or likely to recur); *Aiello v. Town of Brookhaven*, 136 F.Supp.2d 81, 120 (E.D.N.Y.2001) (holding CWA does not allow citizen suit against a past polluter "for the ongoing migrating leachate plume"); *Wilson*, 33 F.Supp.2d at 975–76 (concluding "that migration of residual contamination from previous releases does not constitute an ongoing discharge") (factual background stated in 989 F.Supp. 1159 (D.Wyo.1998)); and *Friends of Santa Fe County v. LAC Minerals, Inc.*, 892 F.Supp. 1333, 1354 (D.N.M.1995) (finding no ongoing discharge from a pile of waste rock on the surface).

Very few reported decisions address situations in which CWA citizen suit defendants no longer owned the property in question at the time of the lawsuit. Even within that small sampling of cases, howev-er, the courts reached widely divergent conclusions. In *United States v. Sea Bay Development Corp.*, No. 2:06–cv–624, 2007 WL 1378544, at *3, 2007 U.S. Dist. LEXIS 33734, at *9–10 (E.D.Va. May 8, 2007), one of the defendants argued that the plaintiff could not state a CWA claim against it because it had no control over the property in question and there was no threat of future violations. The court rejected that argument, finding that "property rights for the land in question [were] irrelevant" when the type of relief sought was a restorative or mitigating injunction (i.e., an order to clean up the past pollution). *Id.* at *3–4, 2007 U.S. Dist. LEXIS 33734, at *11–12.

The court in *Friends of Sakonnet v. Dutra*, 738 F.Supp. 623 (D.R.I.1990), however, came to the opposite conclusion. There, the former owners of the polluting septic system argued, citing *Gwaltney*, that they could not be liable under the CWA because any violations they might have been responsible for were wholly in the past. Upon consideration of the language of § 1365(a) and *Gwaltney*, the court noted that "the phrase 'any person ... who is alleged to be in violation' is clearly directed to a present violation by the person against whom the citizen suit is brought." The court accordingly held that the past owners could not be presently violating the Act and were therefore not properly subject to a CWA citizen suit. *Id.* at 632–33; *see also Brewer v. Ravan*, 680 F.Supp. 1176, 1183 (M.D.Tenn.1988) (dismissing citizen suit based on allegations made against a permanently closed manufacturing plant).

As the variety of conclusions by courts facing the same issue demonstrates, the question of whether this court has jurisdiction over the plaintiff's CWA claims against Day II and PRP is a difficult one. For purposes of the analysis at hand, the

court will consider the plaintiff's CWA claims as having two distinct jurisdictional bases: (1) the ongoing presence of pollutants and/or fill materials deposited during the movants' ownership of the property, and (2) the movants' alleged ongoing violation of their NPDES permits at the inception of the lawsuit. The court will separately address these bases below.

### D. *Previously Deposited Pollutants as a Basis for Jurisdiction*

■ The plaintiff urges the court to adopt the approach taken in the *Woodbury* line of decisions, i.e., that violations of the CWA are ongoing for as long as pollutants remain in the wetlands. The court agrees with the reasoning expressed in those cases. For instance, the court believes it was most likely the intent of the drafters of the Act to enable citizen suits against polluters in situations such as this one. Indeed, to not do so would have the effect of incentivizing polluters to simply conceal their misdeeds, knowing that they will not face CWA liability unless they are essentially caught in the act of polluting. Justice Scalia's concurring language in *Gwaltney*—that a polluter remains "in violation" of the CWA "so long as it has not put in place remedial measures that clearly eliminate the cause of the violation"—seems to confirm this interpretation. 484 U.S. at 69, 108 S.Ct. 376 (Scalia, J. concurring).

The court's analysis of the wholly past/ongoing violation distinction was by no means clear cut: the body of case law applying a strict interpretation of *Gwaltney's* "wholly past" prohibition is similarly well-reasoned and raises several points of concern to the court. For example, some decisions in the *Woodbury* line of cases appear have stretched the present-tense "to be in violation" language of the Act to the conceptual breaking point, potentially running afoul of *Gwaltney's* "wholly past" prohibition. The *Woodbury* approach also holds the potential to raise additional prac-

tical concerns for the courts: What, for instance, is threshold quantity of existing polluting substances necessary to trigger jurisdiction? Would trace amounts suffice?

Nevertheless, the primary factor that influenced the court to adopt the *Woodbury* approach was the nature of the alleged pollution in this case—deposited sediment and fill material. Unlike discharges of a leachate plume, *see Aiello,* 136 F.Supp.2d at 120, or petroleum products, *see Wilson,* 33 F.Supp.2d 969, 975–76 (facts set forth in separate order at 989 F.Supp. 1159), the fill materials at issue in this case do not significantly dissipate or dissolve over time. Instead, these fill materials, when discharged into a system such as the plaintiff's lakes, stay intact over time and thus continue to have roughly the same net polluting effect years or even decades after the time of their deposit.

This distinction seems to be borne out by the relevant caselaw. The majority of cases dealing with fill materials appear to adopt the approach taken in *Woodbury* of deeming the pollution "ongoing" as long as the polluting fill material remains in the water. *See, e.g., Sasser,* 990 F.2d at 129; *Informed Citizens United,* 36 F.Supp.2d at 377–378; *United States v. Reaves,* 923 F.Supp. 1530, 1534. In contrast, most of the decisions taking the stricter interpretation of "wholly past" violations employed in *Remington* have involved pollutants other than fill materials. *See, e.g., United States Public Interest Research Group v. Stolt Sea Farm, Inc.,* Civil No. 00–149–B–C, 2002 WL 240386, at *6, 2002 U.S. Dist. LEXIS 2757, at *19 (D.Me. Feb. 19, 2002) (blood water); *Friends of Santa Fe County v. LAC Minerals,* 892 F.Supp. 1333, 1354 (D.N.M.1995) (acid mine discharges); *Brewer v. Ravan,* 680 F.Supp. 1176, 1182 (M.D.Tenn.1988) (polychlorinated biphe-

nyls (PCB) effluents); *but see Remington,* 989 F.2d at 1311–13 (lead shot and clay discs as fill material).

Having concluded that the continuing presence of illegally discharged fill material can constitute an "ongoing violation" under *Gwaltney,* all that is left is to confirm that the plaintiff has made a "good faith allegation of continuous or intermittent violation." *Gwaltney,* 484 U.S. at 64, 108 S.Ct. 376. The detailed allegations in the plaintiff's complaint more than meet this low standard. Accordingly, to the extent that the plaintiff's CWA claims against the movants are based on the continuing presence of materials discharged before or after the date of the complaint, those claims will be permitted pursuant to *Gwaltney.*

### E. *Jurisdiction Based on EPD Permit Violations*

■ The plaintiff alternatively asserts that the court has jurisdiction over its claims because they are based on the movants' violations of their state-issued NPDES permits. The court finds this argument to also be persuasive.

Three such permits appear to impact the instant motion. The original permit, which became effective August 1, 2000, was titled "Georgia Environmental Protection Division Authorization to Discharge Under the NPDES, Storm Water Discharges Associated with Construction Activity, General Permit No. GAR100000," ("GAR 100000") and involved the disturbance of five or more acres. GAR 100000 was replaced on August 13, 2003 by several general permits, two of which are relevant here. The first, titled "Georgia Environmental Protection Division Authorization to Discharge Under the NPDES, Storm Water Discharges Associated with Construction Activity For Stand Alone Construction Projects, General Permit No. GAR100001" ("GAR 100001") became effective on Au-

gust 13, 2003. It relates to projects which have no secondary or tertiary permittees such as convenience stores. The other permit is titled "Georgia Environmental Protection Division Authorization to Discharge Under the NPDES, Storm Water Discharges Associated with Construction Activity for Common Developments, General Permit No. GAR100003" ("GAR 10003"), which also became effective as of August 13, 2003. This permit is specifically set up for subdivision developments.

All of the permits require that any discharges under the permit must comply with Georgia Water Quality Standards, which provide that it is a violation to discharge water with turbidity evidenced by a noticeable visual contrast in the color of the water. The permits also require that Best Management Practices ("BMPs"), to prevent or reduce pollution, must be properly designed, installed, and maintained for all construction activities. The permits state, "Unless and until responsibility for a site covered under this permit is properly terminated according to the terms of the permit, **the initial permittee remains responsible** for compliance with all applicable terms of the permit and for any violations of said terms." GAR 100000 [Doc. No. 428, Ex. A], Section I(E); GAR 100001 [Doc. No. 428, Ex. B], Section I(E); GAR 100003 [Doc. No. 428, Ex. C], Section I(E) (emphasis added). A permit is "properly terminated" only by filing a Notice of Termination ("NOT") with the Georgia EPD. Thus, according to the terms of the permits, unless an NOT is received by EPD, the primary permittee's obligations and liability continue indefinitely.

The movants argue that a single NOT filed March 31, 2004, terminated all of their responsibilities under the CWA in connection with the Huntington subdivisions. The plaintiff counters that the March 31 NOT was submitted by Day Investments, a previous owner of the prop-

erty—not Day II. Moreover, the plaintiff argues, the March 31 NOT covered only a portion of the development referred to as Phase II. According to the plaintiff, neither Day II nor PRP ever submitted an NOT for the following portions of the development: Huntington Park Phase III (covered by GAR 100000), Huntington Park/Estates Phase IV (GAR 100000), and Huntington Estates Phase IV (GAR 100001). The parties' conflicting evidence regarding the proper cancellation of the permits establishes a dispute of material fact on this issue. Accordingly, because the court cannot grant summary judgment to the movants regarding the ongoing coverage of the permits, it must move on to the question of the effect of the permits on CWA jurisdiction.

The plaintiff argues that the court has jurisdiction over its CWA claims against the movants on the basis of its allegations that they have engaged in ongoing violation of the terms of their state-issued NPDES permits. As noted, those permits expressly provide that the primary permittee's obligation and liability under the permits continue indefinitely until the permits are properly cancelled through the filing of an NOT with the EPD. The defendant has not shown as a matter of law that the permits were properly cancelled. The question thus posed to the court is whether ongoing violations of state-issued NPDES permit conditions, standing alone, can provide a basis for jurisdiction over CWA claims. That question is particularly pertinent where, as here, any illegal discharges from property under the permittees' control occurred wholly before the filing of the lawsuit.

Fortunately, the Eleventh Circuit has provided specific guidance on the issue. The defendants in *Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993 (11th Cir. 2004), argued that the court lacked jurisdiction to hear the plaintiff's CWA claims

on two grounds: (1) that the alleged illegal discharges were wholly past violations under *Gwaltney*; and (2) that the NPDES permits were obtained pursuant to state law, and that the court therefore lacked jurisdiction over a violation of state law. *Id.* at 1005. The court held that *even assuming the violations were wholly past,* it nevertheless had jurisdiction pursuant to the claims alleging violations of the NPDES permit. *Id.* In reaching this conclusion, the court based its conclusion on its finding that the language of the Supreme Court in *EPA v. California,* 426 U.S. 200, 223–24, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), and the CWA itself, had "incorporated state law standards under the CWA into federal environmental law for jurisdictional purposes." *Parker,* 386 F.3d at 1006.

The Eleventh Circuit's reasoning in *Parker* applies directly to the jurisdictional questions in this case. Even assuming, *arguendo,* that the movants' alleged discharges were wholly past violations, the court would *still* have jurisdiction over the plaintiff's CWA claims to the extent the plaintiff alleges violations of NPDES permits which were active as of the filing of the case. For purposes of the court's jurisdictional analysis, the plaintiff has made sufficient good faith allegations of such violations. Indeed, the plaintiff has presented numerous expert and lay witness affidavits in opposition to the instant motion wherein the affiants testify that they have observed discharges of sediment and other materials from the Huntington subdivisions into the plaintiff's wetlands subsequent to the filing of the complaint.

The movants counter these affidavits only by arguing that none of the affiants has produced specific, first-hand evidence of a discharge from the relevant lots after the filing of the complaint. While this general assertion might suffice to create a sufficient dispute of fact to preclude an

award of summary judgment for the *plaintiff* on this issue, it certainly does not establish an *absence* of disputed material facts on the issue. Moreover, it would be unreasonable to expect the plaintiff to submit the sort of detailed evidence—including extensive expert reports—which would be necessary to precisely identify the point sources of discharges in connection with a motion on threshold jurisdictional issues, especially where the defendant has not also done so. The affidavits in question constitute sufficient evidence to support a good faith allegation that the movants violated their NPDES permits on or after the date of the complaint.

Thus, to the extent the plaintiff's CWA claims against the movants are premised upon the movants' alleged violation of still-active NPDES permits on or after the date of the complaint, the court finds that it has jurisdiction over the claims. The court's jurisdiction would, under *Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.*, 897 F.2d 1128, 1142 (11th Cir. 1990), extend back to violations which occurred prior to the date of the complaint.

This ruling should not be read to preclude the possibility of a future grant of summary judgment on the permit claims. The movants could, for instance, bring forth evidence conclusively establishing that all of the relevant NPDES permits *were* in fact properly terminated before the complaint was filed. Alternatively, the movants could introduce undisputable evidence that any illegal discharges originated from outside of the properties covered by the permits. The movants simply have not produced such evidence in relation to the instant motion.

### F. Scope of the Order

As noted above, for purposes of its jurisdictional analysis, the court viewed the plaintiff's claims has having two discreet bases: (1) the continuing presence of fill material discharged prior to the complaint, and (2) violations of the NPDES permits on or after the date of the complaint. While the division of the claims in this manner facilitated a conceptual analysis of jurisdiction, from a practical standpoint, these jurisdictional bases overlap within the plaintiff's CWA claims, meaning the claims cannot be cleanly separated along jurisdictional lines. Both bases of jurisdiction are potentially broad enough to encompass the plaintiff's CWA claims in their entirety. Identifying alternative jurisdictional bases within the plaintiff's claims is important, however—even if there is significant overlap between them—in light of the possibility that one of the bases for jurisdiction is disposed of later at a later proceeding.

### Conclusion

For the reasons stated herein motion for partial summary judgment by defendants Day II and PRP [Doc. No. 391] is hereby **DENIED.** As an additional matter, the plaintiff's motion to strike the affidavits of Alec Rickenbaker and Kim Metcalf [Doc. No. 435] is **DENIED.** The court considered the objections raised by the plaintiff in its analysis of the motion for partial summary judgment and finds no grounds to strike the affidavits from the record.[5]

---

**5.** The affidavits in question were submitted by the movants in conjunction with their motion for partial summary judgment. The plaintiff argues that the court should strike the affidavits because they contain false information. The parties' disagreement over the accuracy of the statements at issue formed part of the basis of the court's holding in Section II(E), wherein the court found material disputes of fact regarding the cancellation of the permits precluded a grant of summary judgment on the issue.